640 So.2d 275 (1994)
Linda Vicknair, Wife of/and Edwin VICKNAIR
v.
Antonio DIMITRYADIS, Gulf Marine & Industrial Supplies, Inc. and CNA Insurance Company.
No. 93-CA-0003.
Court of Appeal of Louisiana, Fourth Circuit.
January 13, 1994.
Order Granting Rehearing February 10, 1994.
*276 Dan C. Garner, John G. Munoz, Garner & Munoz, New Orleans, for Linda Vicknair, wife of/and Edwin Vicknair, plaintiffs-appellees.
Scott G. Jones, J. Thaddeus Westholz, Hulse, Nelson & Wanek, New Orleans, for Gulf Marine & Indust. Supplies, Inc., and Continental Cas. Co., defendants-appellants.
Before BYRNES, WARD and PLOTKIN, JJ.
WARD, Judge.
Gulf Marine & Industrial Suppliers, Inc. and Continental Casualty Insurance Company appeal an adverse jury verdict rendered after trial of a rear end automobile accident. The jury found the driver of a Gulf Marine van, Antonio Dimitryadis, 65% at fault, and the driver of the other vehicle, Edwin Vicknair, 35% at fault. Vicknair was awarded $623,500 in damages and his wife, Linda, was awarded $50,000 for loss of consortium.
We affirm in part and reverse in part.
The collision occurred at approximately 9:20 p.m., September 22, 1988, in a well lit section of Clearview Parkway in Jefferson Parish. The road and weather conditions were dry and clear. Dimitryadis, driving a van owned by Gulf Marine and which was insured by Continental Casualty, was southbound on Clearview, when Vicknair, driving a Chevrolet pick-up truck, turned into the southbound lanes of Clearview Parkway from the intersection of Clearview and Bridgeway Street. Dimitryadis' vehicle struck Vicknair's vehicle when both were in the center lane of the three southbound lanes. Both men were driving alone.
The following day, Vicknair went to work but came home around noon complaining of neck pain. At that time, he and his wife decided that he should go to the emergency room to be examined.
At the time of trial, Mr. Vicknair had undergone two cervical fusions, at C-6 and C 4-5. He had pain and was unable to work. Although he had not been released by his primary physician, his specialist expected to release him within two months. It was the consensus of the medical testimony that Vicknair would not be able to return to his former livelihood as a welder because he was unable to wear the required protective helmet and do the work of a welder. The primary physician fixed Vicknair's permanent disability at 20%, while his specialist believed the disability to be 30-40%. Vicknair has a sixth grade education and was 47 years old at the time of the trial.
In addition, approximately two and one-half years after the accident, Vicknair began *277 seeing a psychologist for depression due to his inability to fully recover. He was still under the psychologist's care at the time of trial. He sought damages for past and future lost wages, past and future pain and suffering, and loss of enjoyment of life. Mrs. Vicknair sought damages for loss of consortium, although she and Mr. Vicknair were separated at the time of the trial with little hope of reconciliation.
At the close of plaintiff's case, Mr. Dimitryadis was dismissed because he was never served with a citation, having returned to New York or Greece. After nine days of testimony, a twelve member jury unanimously found Vicknair to be 35% at fault and "Antonio Dimitryadis/Gulf Marine Industrial Supply, Inc." to be 65% at fault.
The parties in this case related two irreconcilable versions of the accident. Vicknair maintains that he was well established in the lane, that the accident occurred between 130 and 160 feet past the intersection of Causeway and Bridgeway, and that the accident was a result of Dimitryadis' inattention and speeding. Gulf Marine and its insurer, Continental, (hereinafter referred to as "Gulf Marine"), maintain that Dimitryadis, while driving the Gulf Marine truck, actually struck Vicknair's vehicle just after Vicknair turned from the intersection onto Clearview 60' from the intersection. Gulf Marine claims that these facts show that the accident occurred either because Vicknair failed to yield to an oncoming vehicle on a superior street or because Vicknair made an unsafe lane change. Both parties presented expert witnesses to support their individual accounts of the cause of the collision.
Gulf Marine claims the trial court erred, causing the jury to reach an erroneous and unjust verdict. Gulf Marine's contentions are summarized in four issues:
1. It was error for the trial court to deny its motion for a mistrial after one of Vicknair's experts testified that at the time of the accident Dimitryadis' driver's license had been revoked in New York and suspended in Louisiana.
2. Alternately, if the trial court did not abuse its discretion in denying the motion for mistrial, Gulf Marine contends the trial court compounded the error by telling the jury an employer is liable for an employee's actions of driving without a valid driver's license.
3. The assignment of 65% fault to Dimitryadis and 35% fault to Vicknair was a manifestly erroneous finding of facts and an error in applying the appropriate law.
4. The jury award of $623,500 in a lump sum was excessive.
Gulf Marine filed motions in limine to bar production of evidence that Dimitryadis was driving without a license and the trial court ruled that the evidence was inadmissible. In spite of the ruling, during trial, Vicknair's counsel questioned his accident reconstruction expert, Deputy Superintendent of Police, Raymond Burkhart, about Dimitryadis' driver's license. Burkhart testified that Dimitryadis did not have a valid driver's license at the time of the accident, that his license was suspended in New York and that he had "numerous citations" for traffic violations. See Tr.Vol. VII, pp. 140-144 which is quoted below.
BY MR. MUNOZ: [Counsel for Vicknair]
Q. What driving records have you reviewed on Mr. Dimitryadis?
Mr. Jones: [Counsel for Gulf Marine] May we approach the bench?
THE COURT:
Let's not get back into that. I have already issued the instructions to the attorneys so be guided ... by the instructions by the Court.
Mr. MUNOZ:
We have been through it a number of times. If we could have a short bench conference ...
THE COURT:
No.
Q. What is your understanding with regard to the status of Mr. Dimitryadis' driving privileges at the time of this accident?
A. They were revoked. He had a New York driver's license and it was suspended. He had numerous citations.
Mr. Jones then moved for a mistrial and the trial court ordered the parties to discuss the motion in chambers, out of the presence of *278 the jury. The trial court conducted a hearing in chambers, where both Gulf Marine and Vicknair argued for and against the motion. The trial judge considered the effect of the testimony, and then determined that the harm of the inadmissible testimony could be cured by admonishing the jury to disregard that part of Burkhart's testimony, and, after admonishing the jury, the trial court denied Gulf Marine's motion for a mistrial. Gulf Marine argues now as it did in trial that this testimony was so irrelevant and unduly prejudicial that the trial court's instructions could not cure the defect, that when the jury heard this inadmissible evidence it became impossible for the jury to reach a correct and just verdict, and that a mistrial was the only remedy.
Trial courts have great discretion in determining whether or not to grant a mistrial. Searle v. Travelers Insurance Co., 557 So.2d 321 (La.App. 4th Cir.1990). The Louisiana Code of Civil Procedure does not expressly provide for mistrials, but mistrials have been recognized by the courts. Spencer v. Children's Hospital, 432 So.2d 823 (La. 1983). Generally, courts have accepted that a mistrial is a drastic remedy. As a consequence, the following guidelines have been established by Louisiana jurisprudence for granting a motion for mistrial in civil cases: 1) the error or irregularity makes it impossible to reach a proper verdict, 2) there is no other remedy that will provide relief to the moving party, and 3) the prejudicial misconduct cannot be cured by instruction or admonition. Lewis v. Time Saver Stores, Inc., 599 So.2d 442 (La.App. 4th Cir.1992).
In spite of the above, in this case we hold that it was error for the trial court not to grant a mistrial. The questions asked by counsel, and the answers given by Mr. Burkhart, an experienced witness and a lawyer, informed the jury of evidence which the trial court had previously ruled could not go to the jury. Since the liability of Gulf Marine and Continental Casualty was not an issue because this was an insured vehicle, there was no probative value in this evidence. Vicknair did not have to show Gulf Marine negligent before it could recover from Continental. Therefore, it is clear that in this case, in light of the pre-trial ruling barring that testimony, the trial court should have ordered a mistrial. An admonition was not sufficient.
Gulf Marine next argues that the trial court's jury instructions were erroneous, and compounded the trial court's prior error in denying a mistrial. The instructions complained of told the jury (1) Louisiana statutes prohibit an unlicensed driver from operating a motor vehicle, and (2) Louisiana statutes make it "unlawful for any person or entity to employ any person as a driver of a motor vehicle if said person being employed does not have a current, valid license ..." La.Rev. Stat.Ann. § 32:52 and § 32:417 (West 1993). Gulf Marine claims these instructions, given after the jury was directed to disregard the testimony given by Chief Burkhart concerning Dimitryadis' suspended driver's license, confused and misled the jurors, thereby, tainting their verdict.
In deciding whether error in jury instructions constitutes reversible error, an appellate court must consider whether the erroneous instructions probably contributed to the jury verdict. Dye v. Schwegmann Giant Supermarket, 607 So.2d 564 (La.1992), reh'g denied, 609 So.2d 248 (La.1992).
In this case, the instructions compounded Counsel's trial error of presenting inflammatory testimony to the jury which the trial court ruled had previously ruled inadmissible; testimony about the suspension of Mr. Dimitryadis' driver's license and alleged traffic citations (not convictions).
When a trial court instructs a jury to disregard testimony, it virtually asks the impossible. That it may always be impossible is vividly illustrated in this case because, in spite of the forceful admonition by the trial judge to disregard the testimony, after the jury instructions the jury returned to court and asked:
Can Mr. Dimitryadis be considered negligent because he did not have a license?
(The trial court merely referred the jury to the jury charges previously given.)
Obviously, the jury charges forcefully reminded the jury of Burkhart's testimony.
*279 Another compelling reason why those charges should not have been given is that they were not based upon any evidence that Dimitryadis did not have a license. When the trial court ruled Burkhart's testimony inadmissible, there was no evidence of Dimitryadis driving without a license. The trial court's instructions may have been ineffective as to the jury, but they effectively excluded from the record that part of Burkhart's testimony which is the only grounds for giving the objectionable instructions.
If there is no factual basis for a charge, then the giving of that charge may be error if it could have influenced the jury's verdict to the prejudice of a party. Bowling v. Mutual Life Insurance Company of New York, 168 So.2d 107 (La. 4th Cir.) 1964, writ denied, 247 La. 248, 170 So.2d 508 (1965)
Considering the above, we have no difficulty finding that the erroneous jury instructions contributed to the jury's verdict. And, considering both the denial of a mistrial and the erroneous instructions to the jury, we conclude that in this case Dye v. Schwegmann, supra, means that this court must render its own verdict independent of the jury's verdict.
When deciding the question of comparative fault, we are mindful that "In apportioning fault, the trier of fact must consider both the nature of the conduct of each party and the extent of causal connection between conduct and damages." Jaffarzad v. Jones Trucking Lines, Inc., 561 So.2d 144 (La.App. 3rd Cir.1990), writ denied, 565 So.2d 450 (La.1990). Also, in Louisiana there is a presumption that in a rear-end collision the trailing vehicle is at fault unless the driver successfully rebuts that presumption. Cisneros v. Ferro, 411 So.2d 1212 (La.App. 4th Cir. 1982), writ denied, 413 So.2d 505 (La.1982).
Mr. Vicknair was the only eyewitness to testify, and Mr. Dimitryadis' deposition was not introduced into evidence. No evidence was presented that Mr. Dimitryadis could not have prevented the collision by changing lanes. Vicknair testified that he saw lights approaching in the distance but thought he could safely enter the center lane. Vicknair entered a favored heavily traveled street from an intersection of little or no traffic activity. Trooper Johnson, an independent witness, testified as an expert that Vicknair entered a favored street, through a yield sign, and in his opinion this was the cause of the accident and that is why he cited Vicknair for a traffic violation. He testified that after the accident, but before he arrived, Vicknair moved his vehicle so as to be closer to Dimitryadis' van. Based on the above we conclude that both parties were equally at fault, and we apportion fault 50% to Vicknair and 50% to Dimitryadis.
On the question of damages, we do not believe that Dye v. Schwegmann Supermarkets, supra, requires an appellate court to ignore those jury findings that were untainted by the erroneous instructions. In any event, although Gulf Marine contests the lump sum of $623,500 awarded to Mr. Vicknair as excessive, we do not differ greatly with the jury findings as to damages, and whether we review the jury's damage award under a manifest error standard or independently, we reach the same result.
General damages covers past and future lost wages, past and future pain and suffering, loss of enjoyment of life, and consortium. Expert economists for both parties based their calculations on the same information; the date of the accident, Vicknair's age, his average number of working years remaining, and his income tax returns from 1986, 1987, and 1988. For calculating purposes, the three tax returns were added together to arrive at an average yearly salary and adjusted for business related expenses. Neither expert included any past or future medical expenses, pain and suffering, or consortium in their computations.
Plaintiff's expert, Dr. Wolfson, professor of economics and finance at the University of New Orleans, estimated Vicknair's average yearly wage to be $26,466 at the low end and $48,000 at the high end of the range. $48,000 was Vicknair's high salary when he traveled out of state for the higher paying jobs. Both Mr. and Mrs. Vicknair testified that they had planned to again travel out of state for the higher paying jobs after their son was older.
*280 The past lost wages range was then calculated to be from $92,739 to $168,196. The future lost wages range was calculated using a 13 year work life and a 5.4% change for inflation and rate increase. Dr. Wolfson estimated that Vicknair would need $285,721 to invest at 7.5% interest rate in order to earn $21,400 per year if he worked until he was 60 years old. The amount needed to invest jumped to $375,000 to compensate Vicknair for lost wages if he worked until he is 65. The high range requires $518,197, (age 60), or $675,000, (age 65).
Dr. Wolfson then testified that a 15% fringe benefit is common in union contracts and changed the estimates accordingly. Using the lowest average income of $26,466, past lost wages = $106,649; future lost wages working until age 60 = $328,579, and working until age 65 = $431,250. When the high wage of $48,000 is used, past lost wages plus 15% fringe benefits = $193,425; future lost wages plus 15% fringe benefits = $595,926 working until age 60, and $776,250 working until age 65.
Dr. Wolfson concluded that if Vicknair goes back to work at minimum wage, $4.25 an hour, working 40 hours a week for 52 weeks, he will make $8,840 per year. Over Vicknair's remaining working years this would allow a $95,000 deduction from the $375,000 estimate, or $280,000; or a deduction of $125,000 from the $431,000, or $306,000.
Defendants' expert economist, Dr. Boudreaux of Tulane University, found Vicknair's average yearly salary to be $24,606.73, before taxes. His estimate of Vicknair's past lost wages, $71,404.36, was based on multiplying the 3.53 years from the date of the accident to the date of the trial times $24,606.73.
Dr. Boudreaux then calculated Vicknair's future lost wages using the 12.6 remaining years of Vicknair's 16 year future working years and a 7.25% discount factor. He determined that between $140,000 to $165,000 invested today at 7.5% would insure that Vicknair will receive the average salary of $24,606. Boudreaux did not calculate fringe benefits because if Vicknair works at minimum wage full time for six months, the odds are 90% that fringe benefits will be included with that job. His range allowed for a 2% to 5% increase, which is based on long-term rates of annual increases of income, not hourly wages. Computing the 5% increase, the invested lump sum, and a minimum wage job, at the end of the Vicknair's working years he would be earning $45,500, after expenses.
Reviewing the evidence in its entirety, we find the jury award is not manifestly erroneous. Mr. Vicknair, a 47 year old man with a sixth grade education, has undergone two cervical fusion surgeries, and it was undisputed at the time of the trial that he was still in pain. Medical testimony from both sides agreed that he will never be able to return to his former profession as a welder. The award granted by the jury was neither the highest nor the lowest presented at trial. "The primary purpose of the judge or jury in fixing the award in a personal injury case is to adequately compensate the injured person for his injury under the facts shown to exist in his case." Reck v. Stevens, 373 So.2d 498 (La.1979). An award may not be disturbed unless the record clearly reveals that the trier of fact abused its great discretion, and this must be determined on a case by case basis. No such abuse of discretion was shown here, therefore, we affirm the $623,500 in damages.
Mrs. Vicknair was awarded $50,000 for loss of consortium. Loss of consortium has been broken down into seven kinds of losses: "love and affection, society and companionship, sexual relations, right of performance of material services, right of support, aid and assistance, and felicity." Johnson v. Aetna Casualty & Surety Company, 575 So.2d 458 (La.App. 3rd Cir.1991), reh'g denied 1991; writ denied 1991.
Louisiana appellate courts do not favor high consortium awards. Id., at 465. The general range appears to be between $5,000 and $10,000, with generally high awards having been reduced. Some of the reductions are as follows: American Motorist v. American Rent-All, 579 So.2d 429 (La. 1991), reduced an award of $55,000 to $10,000; Spangler v. North Star Drilling Co., 552 So.2d 673 (La.App.2d Cir.1989), reduced a $75,000 award to $25,000; Vaccaro v. *281 Sports & Imports, Inc., 539 So.2d 989 (La. App. 4th Cir.1989) writ denied, 541 So.2d 1391 (La.1989), reduced an $85,000 award to $25,000.
Usually a loss of consortium award above $25,000 involves a permanent disruption of the marital relationship created by one spouse's severe, often disabling, injuries. Peter v. Allstate Ins. Co., 563 So.2d 1309 (La.App. 3rd Cir.1990). A $25,000 consortium award was affirmed where a spouse's deteriorating back condition caused a fear of paralysis and a disruption of family life. Mercer v. Fruehauf Corporation, 492 So.2d 538 (La.App. 3rd Cir.1986), writ denied, 496 So.2d 350 (La.1986). A $50,000 award was confirmed where a spouse's permanent vascular and orthopedic injuries produced 100% functional disability. Scott v. Hospital Service District No. 1, 496 So.2d 270 (La.1986). A $75,000 award was affirmed where multiple injuries resulted in 55%-60% total permanent disability and the marriage deteriorated to the point where the wife required psychiatric care. Tracy v. Parish of Jefferson, 523 So.2d 266 (La.App. 5th Cir.1988), writ denied, 530 So.2d 569 (La.1989) reconsideration denied, 532 So.2d 141 (La.1988).
In the instant case, Mr. Vicknair is not severely disabled; his disability is between 20%-40%. He will be able to return to some type of work and he is able to care for himself. There is no doubt that this accident has been a trying time for both Mr. and Mrs. Vicknair, but Vicknair was convicted of the crime of obscenity during this marriage, and this materially reflects on claims that this was a close relationship. Moreover, the Vicknairs lacks of a close relationship was shown by the fact that they were separated at the time of trial with little chance for reconciliation. Therefore, the above-mentioned circumstances do not merit a $50,000 consortium award and we reduce the award to $15,000.
In sum, we hold Antonio Dimitryadis and Edwin Vicknair each to be 50% at fault. We find Edwin Vicknair's damages to be $623,500.00, and Linda Vicknair's damages to be $15,000.00. We find Gulf Marine to be liable for Dimitryadis' negligence, and that Continental Casualty Company is the liability insurer of Gulf Marine. Damages must be paid in proportion to the allegations of fault. Costs of trial and appeal are also assessed equally.
AFFIRMED IN PART; REVERSED IN PART, AND RENDERED.

REHEARING GRANTED
PER CURIAM.
Appellee, Mrs. Linda Vicknair, filed a Petition for Rehearing contending, among other things, that this Court erred in reducing ex proprio motu, the lower court's consortium award. A review of the record and briefs supports this assertion.
Therefore, the rehearing is granted solely for the purpose of reinstating the original consortium award of $50,000. In all other respects, our judgment is affirmed.
REHEARING GRANTED.